CHARLES KEESHIN, INC., an Illinois Corporation, Plaintiff,

v.

FARMERS & MERCHANTS BANK OF ROGERS, an Arkansas Corporation; Farmers Produce Co., an Arkansas Corporation, Frank Hall and Charles L. Garrett, Defendants.

CHARLES KEESHIN, INC., an Illinois Corporation, Plaintiff,

v.

Jeff DUTY, Nelson Dodd, Al Hollingsworth, Jeff Brown, Frank Hall, and Hardy Croxton, Defendants.

Civ. A. Nos. 438, 440.

United States District Court
W. D. Arkansas,
Fayetteville Division.

Nov. 21, 1961.

---

Maurice H. Kamm, Chicago, Ill., Rose & Kizer, Fort Smith, Ark., for plaintiff.

Shaw, Jones & Shaw, Fort Smith, Ark., James T. McDonald, Rogers, Ark., for Farmers & Merchants Bank of Rogers, Farmers Produce Co., Frank Hall and Charles L. Garrett.

Crouch, Jones, Blair & Cypert, Springdale, Ark., J. William Murphy, Fayetteville, Ark., for Jeff Duty, Nelson Dodd, Al Hollingsworth, Jeff Brown, Frank Hall and Hardy Croxton.

JOHN E. MILLER, Chief Judge.

The above causes were consolidated for hearing and disposition of the pending motions to dismiss now before the court. The motions are bottomed upon the contention that the Keeco Sales Corporation, organized and existing under the laws of Arkansas, is an indispensable party plaintiff in the present cases, and that if such corporation is made a party plaintiff, there will not be the requisite diversity of citizenship to support the jurisdiction of the court.

On May 26, 1961, the plaintiff filed its complaint in Civil No. 438, seeking to recover the amounts of checks drawn on the account of the Keeco Sales Corporation, which the plaintiff alleges were in fact illegal payments and for which the defendants are liable. Summons was served on all of the defendants on May 27, 1961, except defendant Frank Hall, who was served on June 3, 1961.

On June 7, 1961, the defendants filed a motion to dismiss on the ground that the complaint failed to state a claim. On June 12, 1961, the court overruled that motion, and the question therein raised is no longer before the court.

On June 21, 1961, the defendants filed their original answer, but on July 25, 1961, they filed an amendment to the answer, in which they alleged that the Keeco Sales Corporation, an Arkansas corporation (Keeco), is an indispensable party, and that upon the joinder of Keeco as a party plaintiff, the court would be divested of jurisdiction.

On June 2, 1961, plaintiff in Civil No. 440 filed its complaint seeking to recover damages which it alleges arose from the seizure of property and assets of the plaintiff and its subsidiary, Keeco Sales Corporation (Keeco), by the defendants, acting as trustees for the benefit of creditors under the provisions of a purported assignment, entitled "Indenture and Trust Agreement," which was signed by the defendants either purporting to represent plaintiff and its subsidiary, Keeco, or the several creditors. Summons was served on all of the defendants on June 3, 1961.

On July 8, 1961, the defendants filed a motion to dismiss which contained the same allegations as the amended answer filed by defendants in Civil No. 438 on July 25, 1961.

It appearing that the same or similar questions were involved in the respective motions to dismiss, the motions in both cases were set for hearing at Fort Smith, Arkansas, on August 31, 1961.

The hearing on the motions was held at the time and place set, at which time ore tenus and documentary evidence were introduced by both sides, and oral arguments in support of and in opposition to the motions were made. Comprehensive briefs have been submitted by the learned counsel for the parties for the court's consideration at times prior and subsequent to the hearing.

It is admitted that the plaintiff in both cases, Charles Keeshin, Inc., is a corporation duly incorporated and existing under the laws of the State of Illinois; that the corporate defendants are corporations organized and existing under the laws of the State of Arkansas; that the individual defendants are all citizens and residents of the State of Arkansas; and that Keeco is a corporation organized

and existing under the laws of the State of Arkansas.

Keeco was organized under the laws of the State of Arkansas in May 1956, and functioned until September 1958, when it suspended its operations. It was the sales outlet for Charles Keeshin, Inc., which was doing business in Arkansas as Keeshin Poultry Company and Kish-Rock Poultry Farm. It was held out to the public as a division of the Keeshin Poultry Company. Keeco, Kish-Rock, and the Keeshin Poultry Company shared the same office in Rogers, Arkansas, and the same managerial and administrative personnel operated Keeco, Kish-Rock and Keeshin Poultry Company from the same office. However, separate books and accounts were maintained for each of the organizations.

The corporate structure of Keeco is as follows: President, June Keeshin; Vice President, Seymour Keeshin; Secretary, Frank Hall; and Bookkeeper, Sue Craig.

Seymour Keeshin is the President of the plaintiff, Charles Keeshin, Inc., but Charles Keeshin, his father, is the majority stockholder. Although June Keeshin is the wife of Seymour Keeshin, she owns no stock in her own name in Charles Keeshin, Inc. The defendant, Frank Hall, is a minority stockholder in Keeco, but his only connection with Charles Keeshin, Inc., was that he was employed as general manager of Kish-Rock and Keeshin Poultry Company in Rogers, Arkansas. He received his orders directly from Seymour Keeshin as to matters of policy or over-all operations of the Keeshin enterprises in Rogers, but it was his duty and responsibility to make decisions as to the day-to-day operations since Seymour Keeshin spent most of his time in Chicago. Keeshin made only periodic business trips to Arkansas, and Hall had no occasion to go to Chicago. Other than communicating by letter or by phone, Keeshin and Hall would on occasion have a conference at some intermediate location or on the few instances that Keeshin came to Arkansas.

The majority stockholders of Keeco and the plaintiff, Charles Keeshin, Inc., were closely related and the dealings between the corporations were far from being at arm's length. Keeco derived the bulk of its operating capital from the plaintiff. Furthermore, as the sales outlet, it received preferential rates in the purchase of the poultry products of Keeshin Poultry Company, and in reciprocation it resold to Charles Keeshin, Inc., the same products at a like preferential rate.

As to the external appearance of these corporate manipulations, the defendants introduced at the above-mentioned hearing on August 31, two letters:

The first marked as defendants' Exhibit 1, dated October 31, 1956, upon the stationery of Charles Keeshin, Inc., which was addressed to Mr. Charles Garrett as President of the defendant Farmers & Merchants Bank of Rogers, Arkansas, reads as follows:

"Dear Charlie:
"This is to certify that all goods and merchandise transferred from Keeshin Poultry Company to Keeco Sales Corporation and assigned to Farmers & Merchants Bank is a good, complete, and valid transfer of title, and that Keeshin Poultry Company relinquishes all right, title and interest in said property.
"Yours very truly,
"Keeshin Poultry Company
"/s/ Seymour M. Keeshin
"Seymour M. Keeshin
"President"

The second letter marked as defendants' Exhibit 2, dated July 23, 1957, upon the stationery of Keeco Sales Corporation, Division of Keeshin Poultry Company, General Offices Chicago, Illinois, reads as follows:

"To Whom It May Concern:
"Re: Notice of Separate Entity.
"I, June Keeshin, President of Keeco Sales Corporation, Rogers, Arkansas, declare the following to be the correct and just statement of facts:
"Keeshin Poultry Co., Rogers, Arkansas, packs and sells to Keeco Sales

Corporation and Arkansas corporations whereby Keeco Sales Corporation, a separate entity, sells on commission to accounts. When Keeco Sales sells to accounts, Keeco has to pay Keeshin Poultry Co. for the product; upon Keeco receiving payment, they pay Keeshin Poultry Co.

"On a sale from Keeshin to Keeco to Kish-Rock, the transaction includes two separate and distinct corporations and is not, and should not be confused as the same companie or corporations.

"I, June Keeshin, President of Keeco Sales Corporation, have no interests in Keeshin Poultry Co., Kish-Rock Poultry Co., Chas. Keeshin, Inc., and never have had any association with aforesaid companies.

/s/ June Keeshin

June Keeshin, President"

By September 1958, at which time Keeco suspended its operations, Charles Keeshin, Inc., apparently was in financial difficulties, and on February 16, 1959, filed its petition in the United States District Court, N.D.Ill., E.Div., seeking an arrangement under Chapter XI of the Bankruptcy Act. As for Keeco, its assets were impounded by the Benton Chancery Court on July 10, 1959, pending further orders by that court. This action by the Benton Chancery Court grew out of a complaint filed by the defendant trustees on November 1958 against Keeco and the plaintiff, Charles Keeshin, Inc., in which they sought to have a judgment against Keeco and Charles Keeshin, Inc., for the total amount of the claims of the creditors represented by the trustees. After intervention on behalf of Benton County to secure a tax lien on the above assets and after the Referee in Bankruptcy for the United States District Court for the Northern District of Illinois, E. Div., entered an order, dated June 24, 1959, directing the trustees to deliver the assets in question, the court found that it should impound the assets held by the trustees until the rights of the various parties could be fully determined.

Stated simply, the motions before the court present this issue: Whether Keeco is an indispensable party plaintiff to the causes of action of Charles Keeshin, Inc., and if so, whether the citizenship of Keeco is such as to destroy the diversity of citizenship of the parties requisite to support the jurisdiction of this court.

Therefore, the first question to be decided is whether Keeco is an indispensable party plaintiff to the present causes of action. This court considered the same question in Young v. Garrett, 3 F.R.D. 193 (D.C.W.D.Ark.1953), aff'd 149 F.2d 223 (8 Cir. 1945), in which it made the following statement of the general rule concerning indispensable parties at page 194:

"(1) The absence of an indispensable party may be raised by motion to dismiss. Hale v. Campbell et al., D.C.N.D.Iowa, 40 F.Supp. 584. See, also, Supplementary Commentary, 5 Federal Rules Service, pages 820–822.

"(2) Indispensable parties are those whose interests are so bound up in the subject matter of the litigation and the relief sought that the court cannot proceed without them, or proceed to a final judgment without affecting their interests. Division 525, Order of Railway Conductors of America et al. v. Gorman et al., 8 Cir., 133 F.2d 273, 276; State of Washington v. United States, 9 Cir., 87 F.2d 421; Bland et al. v. Fleeman et al., D.C.W.D.Ark., 29 F. 669; Franz v. Buder, 8 Cir., 11 F.2d 854; State of California v. Southern Pac. Co., 157 U.S. 229, 15 S.Ct. 591, 39 L.Ed. 683.

"(3) If indispensable parties have been omitted and the making of them parties properly aligned on the basis of their actual legal interest and the apparent result to them would destroy the requisite diversity of citizenship, the causes should be dismissed for lack of jurisdiction. 28 U.S.C.A., § 80; Thomson et al. v. Butler et al., 8 Cir., 136 F.2d 644."

In deciding whether there are grounds for dismissal under the general rule, there are certain criteria which must be considered in order to determine whether a party is indispensable to a cause of action. A landmark case which set forth these criteria is State of Washington v. United States, 87 F.2d 421 (9 Cir. 1936), in which the court, beginning at page 427, stated:

"There are many adjudicated cases in which expressions are made with respect to the tests used to determine whether an absent party is a necessary party or an indispensable party. From these authorities it appears that the absent party must be interested in the controversy. After first determining that such party is interested in the controversy, the court must make a determination of the following questions applied to the particular case: (1) Is the interest of the absent party distinct and severable? (2) In the absence of such party, can the court render justice between the parties before it? (3) Will the decree made, in the absence of such party, have no injurious effect on the interest of such absent party? (4) Will the final determination, in the absence of such party, be consistent with equity and good conscience?

"If, after the court determines that an absent party is interested in the controversy, it finds that all of the four questions outlined above are answered in the affirmative with respect to the absent party's interest, then such absent party is a necessary party. However, if any one of the four questions is answered in the negative, then the absent party is indispensable."

In accord: Wesson v. Crain, 165 F.2d 6 (8 Cir. 1948).

█ It is to be noted that the underlying prerequisite for an indispensable party is that it must be an interested party in the cause of action. In the present cases there is no doubt that Keeco meets this preliminary requirement, for its assets alone are the bone of contention between the parties.

Having established the interest of the absent party, the first question is whether the interest of the absent party is distinct and separable. Or, stated otherwise, is the interest of a subsidiary corporation severable from that of its parent? Ordinarily the answer to this would be in the affirmative, but this is not necessarily the answer when the parent corporation alleges in its complaint that the subsidiary's property is in fact that of the parent and that the subsidiary is no more than a shell or a hollow pretense of a corporate entity as the plaintiff, Charles Keeshin, Inc., has alleged in the present cases. This is readily apparent from the second paragraph of the complaint in Civil No. 438, which reads as follows:

"2. Prior to September 27, 1958, the plaintiff carried on a substantial business in the State of Arkansas under the name of Keeco Sales Corporation. This corporation, although organized under the laws of the State of Arkansas, was in fact and in law nothing more than a division of the plaintiff corporation, and all of its property, bank account, and assets were in fact and as a matter of law the property of Charles Keeshin, Inc., the plaintiff herein, said Keeco Sales Corporation being the instrumentality of the plaintiff, and not existing in substance or reality as a separate corporate entity. The assets of the plaintiff and of Keeco Sales Corporation were physically intermingled and intermixed at all times from the inception of Keeco Sales Corporation, and the activities of both corporations were conducted from a common office. All assets of Keeco Sales Corporation, all accounts receivable, and all causes of action accruing to Keeco Sales Corporation are the property of the plaintiff, Charles Keeshin, Inc.";

and the third paragraph of the complaint in Civil No. 440, which reads as follows:

"3. Keeco Sales Corporation was organized under the laws of the State of Arkansas in May, 1956, and from the date of its incorporation until September, 1958, when said corporation suspended operations, was treated as a division of the plaintiff and operated in the same manner as Keeshin Poultry Company and Kish Rock Poultry Farm, and held out to the public as a division of the plaintiff. The assets of the plaintiff and Keeco Sales Corporation were physically intermingled and intermixed at all times, the separate corporation existence was and has been in form only, and all of the assets were and are in fact the property of the plaintiff."

Therefore it is apparent that the plaintiff is in no position to contend that the interest of Keeco is distinct and separable.

The second question to be decided in this connection is whether, in the absence of the interested party, the court can render justice between the parties before it. Based on the bare allegations, it would appear at first glance that the rendering of justice would not be affected by the absence of Keeco. However, if there should be a trial on the merits of the case, the plaintiff, as an evidentiary matter, would have to bear the burden of proof to show the operations and actions of Keeco after having denied such actions and operations of Keeco as a separate entity. In other words, the plaintiff, through its corporate agents, would be in the anomalous position of attempting to prove to the court's satisfaction transactions carried on by a phantom corporation and its phantom agents.

It is conceivable that such an absence of an interested party would prevent the court from rendering justice in what appears to be an unnatural situation.

The third question is whether the decree made in the absence of the interested party would have no injurious effect on the interest of such absent party. Doubtlessly, there would be an injurious effect on the interest of the absent Keeco, because, as stated above, it is the assets of Keeco that are involved in this litigation. If Keeshin is denied recovery of the value of the assets involved, the loss would be suffered by Keeco.

The fourth question is whether the final determination in the absence of the interested party will be consistent with equity and good conscience. The answer to this question is to be found in relation to the plaintiff's position, the defendants' position, and in the position of the absent interested party. As to the plaintiff, Charles Keeshin, Inc., it must be borne in mind that Keeco was incorporated under the laws of Arkansas at the instigation of the plaintiff in order to carry out the plaintiff's business objectives in Arkansas. Furthermore, the two above-mentioned letters were addressed for the purposes of (1) establishing Keeco's credit to enable it as an entity to carry on its operations in and around Rogers, Arkansas, and (2) to attempt to insulate the plaintiff, Keeshin, from any liabilities that might arise from such financial transactions. Having made these representations and having obtained credit for Keeco, it would seem that equity and justice would dictate the retention of Keeco as a corporate entity for the purposes of litigation. If the plaintiff has a meritorious cause, as it alleges, there should be no reason why it cannot pursue recovery in the name of Keeco, subject to any defense the defendants may have against Keeco.

As to Keeco, an existing Arkansas corporation, the ends of equity and justice would not be best served by denying it the opportunity to recover its assets in its own name. As stated above, if plaintiff were to be allowed to prosecute the causes of action alleged in the present cases and it were to fail, then Keeco would probably be estopped from later prosecuting its own cause of action in its own name.

As to the defendants, a claim is being prosecuted against them based on their transactions with Keeco. They are now put in a position of defending their prior dealings with an Arkansas corporation, which the plaintiff contends was a mere

sham and was never intended to be a real entity. If there should be a trial on the merits, it is conceivable the defendants would be in a position to defend on the basis of set-off or by counterclaim. However, the fact that they would be denied the opportunity to counterclaim or make a defense on the merits against the party from whose operations this litigation arose, surely a final determination in the absence of Keeco in relation to all of the parties would not be consistent with equity and justice.

Therefore, the court holds that Keeco is an indispensable party plaintiff. State of Washington v. United States, supra; Young v. Garrett, supra; Wesson v. Crain, supra.

In the alternative, it may be mentioned that there are valid reasons for holding that Keeco, as well as being an indispensable party, is also the real party in interest.

Rule 17, Fed.R.Civ.P., 28 U.S.C.A., reads as follows:

"(a) Every action shall be prosecuted in the name of the real party in interest; * * *."

Stated in different language in 3 Moore's Federal Practice, 2d Ed., Sec. 17.07, p. 1330:

"Cases construing the real party in interest provision can be more easily understood if it is borne in mind that the true meaning of real party in interest may be summarized as follows: An action shall be prosecuted in the name of the party who, by the substantive law, has the right sought to be enforced. * * *"

Since this is a diversity case concerning rights and obligations incurred in Arkansas, the law of Arkansas pertaining to corporations and corporate entities is the controlling substantive law. Henderson v. Rounds & Porter Lumber Co., 99 F.Supp. 376 (D.C.W.D.Ark.1951). Where litigation between corporations is involved, there first must be established a corporate entity in order for there to be a real party in interest. It appears that there is no hard-and-fast method of arriving at a determination of the real party in interest in these cases as stated in the Henderson case, supra, at page 381:

"Numerous rules, most of them negative in form, have been developed. For instance, ownership of capital stock of one corporation by another does not alone create identity of interests or the relationship of principal and agent; identity of officers alone is not sufficient; and the loan of money by one corporation to another does not make the lender liable for the acts of the borrower. And, there are other negative rules. See: Nichols & Co. v. Secretary of Agriculture, [1 Cir., 131 F.2d 651] supra; Annotation, 145 A.L.R. 475. It is impossible to formulate a general rule applicable to all cases, and the courts have not attempted to do so. Rather the over all picture as it appears from the facts dictates whether or not the power should be exercised."

There is some confusion between establishing a corporate entity for the purposes of labeling it as a real party in interest when it sues or is sued in its own name, and for purposes of piercing the corporate veil in order to rectify a fraud committed on third parties who have dealt with a corporate subsidiary. The rule has been stated in the case of Rounds & Porter Lumber Co. v. Burns, 216 Ark. 288, 225 S.W.2d 1, 2 (1949), where the court made the following statement at page 290 of 216 Ark.:

"Now of course a parent corporation is not liable for the debts of its subsidiary merely because the parent holds the controlling interest or because the two are managed by the same officers. Lange v. Burke, 69 Ark. 85, 61 S.W. 165; Powell, Parent and Subsidiary Corporations, § 6 (a, b). It is only when the privilege of transacting business in corporate form has been illegally abused to the injury of a third person that

".the corporate entities should be disregarded."

■ Where there is no need to pierce the corporate veil in order to prevent fraud on third parties, the Supreme Court of Arkansas has made it plain that it intends to preserve the corporate entity of any Arkansas corporation transacting business in Arkansas. This is so even where there has been intermingling of assets between a parent and a subsidiary corporation as well as interlocking directorates, as stated by the court in Mannon v. R. A. Young & Sons Coal Co., 207 Ark. 98, 179 S.W.2d 457, 460, (1944), beginning at page 103 of 207 Ark.:

> "All corporations, regardless of the fact that the holders of stock and the officers of the corporation are identical, are separate and distinct legal entities; and it follows that, in the absence of facts on which liability can be predicated, one such corporation is not liable for the debts of another. 'The fact that the officers of one corporation are also officers of another does not make the corporations the same, nor the acts of one the acts of the other.' 19 C.J.S. Corporations § 789, p. 166. 'The fact that some of the stockholders in one company had also stock in each of the other companies, and the fact that the general managers and officers of one company were also general managers and officers of another company, did not make these companies the same corporation, nor the acts of one the acts of the other.' Fort Smith Light & Traction Company v. Kelley, 94 Ark. 461, 127 S.W. 975, 979.
>
> "This court, in the case of Lange v. Burke, 69 Ark. 85, 61 S.W. 165, held (headnote): 'The facts that two corporations are practically under the control of the same persons, who are the owners of a large majority of the stock, that the two corporations have intimate business relations, and that they employ the same bookkeeper, each corporation paying one-half

of his salary, do not prove that the two corporations are in fact one and the same * * *.'

> "In the case of G. W. Jones Lumber Co. v. Wisarkana Lumber Company, 125 Ark. 65, 187 S.W. 1068, 1070, Chief Justice McCulloch quoted with approval from Joyce on Actions By and Against Corporations (Sec. 226): ' "The fact that the stockholders of two separately chartered corporations are identical, that one owns shares in another, and that they have mutual dealings, will not, as a general rule, merge them into one corporation * * *. It is an elementary and fundamental principle that a corporation is an entity separate and distinct from its stockholders and from other corporations with which it may be connected." ' "

■ Therefore, under the Arkansas law the allegations of Charles Keeshin, Inc., to the effect that the transactions between it and Keeco, as well as the identity of ownership, served to deprive Keeco of its separate entity, are to no avail except for the purposes of piercing the corporate veil of Keeco in order to fix Keeshin with liability in case of a fraud committed on third persons. It goes without saying that the doctrine of piercing the corporate veil was not conceived for the purposes of protecting the parent corporation by allowing it to bring action against third parties in its own name by disregarding the corporate entity of its own subsidiary. Rule 17, Fed.R.Civ.P.

In State of Washington v. United States, supra, beginning at page 87 F.2d 427 the court said:

> "In cases where there is error in nonjoinder of parties, either necessary or indispensable, the courts have fallen into common error by designating the error as 'jurisdictional.' The defect is not, properly speaking, a jurisdictional one as shown by the following quotation from Shields v. Barrow, supra, 17 How. 130, 141, 15 L.Ed. 158: 'As is observed by this court, in Mallow v. Hinde, 12 Wheat.

(193) 198 (6 L.Ed. 599), when speaking of a case where an indispensable party was not before the court, "we do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity, whatever may be their structure as to jurisdiction; we put it on the ground that no court can adjudicate directly upon a person's right, without the party being either actually or constructively before the court." ' See, also, Barney v. [City of] Baltimore, supra, 6 Wall. 280, 285, 18 L.Ed. 825; State of California v. Southern Pac. Co., supra, 157 U.S. 229, 250, 15 S.Ct. 591, 39 L.Ed. 683; [State of] Minnesota v. Northern Securities Co., supra, 184 U.S. 199, 236, 22 S.Ct. 308, 46 L.Ed. 499; Bogart v. Southern Pac. Co., supra, 228 U.S. 137, 146, 33 S.Ct. 497, 57 L.Ed. 768."

However, since the court has held that Keeco is an indispensable party plaintiff, it is necessary to determine whether the citizenship of Keeco is such as to destroy the diversity of citizenship of the parties necessary to support the jurisdiction of the court.

The plaintiff, Charles Keeshin, Inc., contends that even if Keeco should be found to be an indispensable party, that its principal place of business was in Illinois by virtue of its "nerve center" being there in the person of Seymour Keeshin, doing business as Charles Keeshin, Inc. On the other hand, the defendants contend that Keeco, in addition to being chartered in Arkansas, has its principal place of business in Arkansas by virtue of carrying on the bulk of its business activities in Arkansas. Thus, the court must decide the actual citizenship of Keeco in order to determine whether the alignment of Keeco as a party plaintiff would oust jurisdiction based upon diversity.

The controlling statute is 28 U.S.C.A. § 1332(c), (Supp.1960), which reads as follows:

"(c) For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

In Kelly v. United States Steel Corp., 284 F.2d 850 (3 Cir., 1960), the court considered the identical question, and in its opinion, the court speaking through Judge Goodrich, made the following evaluation of the above provision and the fact situation there before the court, beginning at page 852:

"* * * The new provision is, as appears in its legislative history, an effort to reduce the number of cases coming to federal courts on the ground of diversity of citizenship only.

* * * * * * *

"* * * what facts are significant and determinative in this matter depends upon the standard by which a court looks at the question and evaluates the facts and decides which facts are important and which facts are relatively unimportant. The conclusion that certain facts are or are not helpful in deciding the question is a question of legal standard, or legal concept, and is one for a court to decide as a question of law.

"In some instances the answer will be easy. The simplest case is probably that of a corporation which gets a charter in one state but carries on all its business operations in another state. Obviously, in such a case the connection with the state of charter is nominal and the principal place of business is where the corporate activity is carried on. But from there the question becomes more difficult. A corporation may carry on much of its activity in the state of charter but have another state or perhaps more than one state where a great deal of its business activities take place. In such circumstances one is tempted to try to find some one criterion by which the question can be decided..

"The place of the meeting of shareholders will not do. Corporations under modern statutes may,

have shareholders' meetings in a state other than the state of charter and that place of meeting may be the only corporate act which takes place in that state. The place of meeting of the Board of Directors offers a tempting criterion. This is the more attractive because, subject to the approval of shareholders in some matters, it is the Board of Directors which makes the final decisions regarding corporate activity. One is tempted to say that where those final decisions are made is the principal place of business because the important questions are there decided. But one is on slippery ground in adopting such a test. Subject to the law of charter and the action of shareholders, Boards of Directors may choose their own place to meet at will. One can easily picture a peripatetic board which holds its meetings in some spot where the climate is favorable and recreational opportunities abound. That spot, of course, may change from time to time as the seasons and the board personnel changes.

"One may also look to the place where physical activity is carried on. * * * In the absence of a simple single test we are forced to analyze our question further and endeavor to pick out as best we can the factor or combination of factors that seem to point to one place as the 'principal' place of business. The concept may get artificial in some cases as indeed it is in the case before us. * * *

"The appellants urge upon us that the test should be where the 'nerve center' of the corporation's business is and they urge that the nerve center is New York. We do not find the figure of speech helpful. Dorland's Medical Dictionary tells us that a nerve center is 'any group of cells of gray nerve substance having a common function.'"

See, also, Canton v. Angelina Cas. Co., 279 F.2d 553 (5 Cir. 1960); Maryland Cas. Co. v. Baker, 196 F.Supp. 234 (D.C. Ky.1961); Kaufman v. General Ins. Co. of America, 192 F.Supp. 238 (D.C.Cal. 1961); Gilardi v. Atchison, Topeka & Santa Fe Ry. Co., 189 F.Supp. 82 (D.C. Ill.1960); and Mattson v. Cuyuna Ore Co., 180 F.Supp. 743 (D.C.Minn.1960).

We turn, therefore, from a pleasant and alluring figure of speech to a consideration of the facts of Keeco's business operations.

It is true that Seymour Keeshin was the Vice President of Keeco; that his office was in Illinois; and that he often communicated by phone or by letter with Frank Hall, Keeco's Arkansas manager, and supplemented these communications with infrequent visits to Arkansas. Also, there is no question but that Keeco was a subsidiary of the plaintiff, an Illinois corporation.

On the other side of the coin, Keeco, besides being chartered as an Arkansas corporation, had its one and only office in Arkansas and carried on the great bulk of this business and credit transactions in Arkansas with Arkansas persons, and all of its administrative employees live and work in Arkansas.

■ Considering all that is relevant to the motion before the court, it is the court's view that Keeco's principal place of business is where it is chartered and carried on its sales operations, which was its sole business, and where all of its property, facilities, and its payrolls and personnel are located, rather than in Illinois where its executive director, Seymour Keeshin was located.

One further matter to be considered by the court concerns an instrument entitled "Disclaimer," which the plaintiff has submitted along with its briefs. The disclaimer reads as follows:

"Now comes Keeco Sales Corporation and disclaims any interest in and to the herein litigation, and admits that all rights to recover in this action are those of Charles Keeshin, Inc.

"In Witness Whereof this Disclaimer is executed by the duly au-

thorized officers and the corporate seal affixed thereto.

> Keeco Sales Corporation
> By /s/ June Keeshin
>
> _____
>
> President
>
> Attest:
> /s/ Seymour Keeshin
>
> _____
>
> Secretary
> (Corporate Seal)"

The plaintiff contends that by disclaiming its interest in the case, Keeco, if found to be an indispensable party, could be dismissed as such by order of the court, thereby preserving diversity of citizenship. The case of Grant County Deposit Bank v. McCampbell, 194 F.2d 469 (6 Cir. 1952), is cited in support of this contention.

The court is of the opinion that this disclaimer is of no moment to the cases at hand for two reasons. First, although the disclaimer is signed by two officers of Keeco, it does not recite a resolution adopted by the Board of Directors or approval by the shareholders of such disposition at a duly called meeting authorizing such an important move as disclaiming interest in the present litigation, which is tantamount to the relinquishment of corporate assets. The plaintiff makes much ado about this requisite grant of authority in its complaints, in Civil No. 438 with reference to the signing of corporate checks, which is a day-to-day operation, and in Civil No. 440 with reference to the assignment of assets under the Indenture and Trust Agreement, yet relinquishment of all assets which are the subject matter of the present suits does not seem to merit a similar formality by the Board of Directors and shareholders of Keeco. Second, a careful reading of the case cited by the plaintiff will disclose that the court there allowed the dismissal of an indispensable party in the form of one disclaiming partner, with but a remote nominal interest, out of several partners who were parties plaintiff, where retention of the dismissed partner would have destroyed diversity. The vast difference of importance between one member of the partnership and a whole corporate entity needs no supporting citation. This court does not intend to equate the attempted disclaimer on the part of a corporation with that of one partner out of several who are suing in their own names.

Up to this point the issues to be decided in Civil Actions Nos. 438 and 440 have been identical, and the court's determination of them has had equal bearing on both cases. However, in Civil No. 440 plaintiff contends that the doctrine of res judicata prevents the defendants from relitigating the issue whether Charles Keeshin, Inc., was the owner of all assets of Keeco. In other words, the question is whether this court is precluded from finding Keeco an indispensable party in the present action if a prior finding by a Referee in Bankruptcy, as implemented and confirmed by order of the United States District Court, N.D.Ill., E.Div., disregarded the corporate entity of Keeco in order to make its assets in Arkansas the property of Charles Keeshin, Inc., for purposes of its reorganization under Chapter XI of the Bankruptcy Act.

In 30A Am.Jur. 324, the doctrine of res judicata is stated as follows at page 371:

> "The doctrine of res judicata as stated in many cases is that an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions, and facts in issue, as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction. To adopt the language of the English court in announcing the doctrine in an early case, which has been frequently repeated by the courts, the judgment of a court of concurrent jurisdiction, directly upon the point, is as a plea, a bar, or as evidence, conclusive, between the same parties, upon the same matter, directly in question in another court."

In accord: Fleming v. Cooper, 225 Ark. 634, 284 S.W.2d 857, 58 A.L.R.2d 694 (1955); Carrigan v. Carrigan, 218 Ark. 398, 236 S.W.2d 579 (1951); McCarroll, Comm. of Revenues, v. Farrar, 199 Ark. 320, 134 S.W.2d 561 (1939).

■ In examining the above statement, it appears that the first requisite of the doctrine of res judicata is that there must be a prior existing final judgment. The plaintiff maintains that the present cause of action, Civil No. 440, is derived from the defendants' disobedience of a turnover order made by the Referee in Bankruptcy, N.D.Ill., E.Div., dated June 24, 1959, such order having been based on the same Referee's findings of fact and conclusions of law of the same date, entered in evidence as plaintiff's Exhibit 2, which findings are alleged to have decided for all time the question of Keeco's corporate entity and the possession of Keeco's assets. Paragraph 3 of the Referee's conclusions of law states as follows:

"Keeco Sales Corporation is a division of the debtor and all of its assets are the property of the debtor. The separate corporate existence of Keeco Sales Corporation should be disregarded *for purposes of this proceeding* since it was an instrumentality of the debtor and constituted mere legal paraphernalia, observing form only, and did not exist in substance or in reality as a separate corporate entity." (Emphasis added.)

This finding does not appear to this court to be an existing final judgment when it expressly recites that the above quoted conclusion of law was made *for purposes of that proceeding.*

■ Another requisite element of res judicata is that the prior judgment has been rendered on the merits. The Referee's findings were based on summary jurisdiction granted by 11 U.S.C.A. § 711, which states as follows:

"Where not inconsistent with the provisions of this chapter, the court in which the petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and his property, wherever located."

This procedure is not of the same ilk as the plenary suit plaintiff has brought in this court. Black's Law Dictionary, 4th Ed., defines "summary proceeding" as follows:

"Any proceeding by which a controversy is settled, case disposed of, or trial conducted, in a prompt and simple manner, without the aid of a jury, without presentment or indictment, or in other respects out of the regular course of the common law."

"Plenary" is defined in Black's Law Dictionary, 4th Ed., as "full, entire, complete, absolute, perfect, unqualified."

The findings of the Referee were based on the petition filed by plaintiff's receiver, not by the testimony of the parties and their witnesses. By the wording of the pleadings in the present case, this court is convinced that plaintiff is desirous of proceeding on the merits in a plenary fashion for the first time in Civil No. 440, after having undergone a bare summary procedure in order to create a cause of action by acquiring the assets of Keeco in its own name so that a turnover order would issue against the Arkansas creditors.

This leads to the next requirement of res judicata that there must be the same rights, questions, and facts in issue. The purpose of the prior judgment that plaintiff relies on was to adjudicate the bare question of possession of Keeco's assets so that the Illinois bankruptcy court would issue its turnover order in the name of the plaintiff, debtor in that action. 2 Collier on Bankruptcy, 14th Ed., para. 23.10, has this to say about turnover orders, beginning at page 533:

"One of the more frequent forms of the exercise of summary jurisdiction is the issuance of an order to turn over property or its proceeds to the supervision and control of the bankruptcy court and its officers,

and is commonly called a 'turnover' order. Such an order may apply to any kind of property of the bankrupt estate, and will require the person affected to turn over the property in his possession or under his control to the receiver or trustee. The bankruptcy court has power to cause the assets of the bankrupt to be collected, and may make such orders as are necessary to effect that result, subject to the requirement, however, that a plenary action must be taken where the circumstances demand it. Thus the order may be directed against the bankrupt, his agents or those holding for him, officers of bankrupt corporations holding the corporate property or accountable for it, partners, or any person holding property asserted to be part of the estate under a claim which is not adverse but merely colorable."

As to the weight to be given the judicial deliberation of the rights, questions and facts in the issue involved in such orders, the Supreme Court of the United States, in the case of Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 404, 92 L.Ed. 476 (1948), stated, beginning at page 62 of 333 U.S.:

"To entertain the petitions of the trustee the bankruptcy court not only is vested with 'jurisdiction of all controversies at law and in equity' between trustees and adverse claimants concerning property acquired or claimed by the trustee, 11 U.S.C., § 46, but it also is given a wide discretionary jurisdiction to accomplish the ends of the Act, or in the words of the statute to 'make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this title.' 11 U.S.C. § 11(a) (15).

"In applying these grants of power, courts of bankruptcy have fashioned the summary turnover procedure as one necessary to accomplish their function of administration. It enables the court summarily to retrieve concealed and diverted assets or secreted books of account the withholding of which, pending the outcome of plenary suits, would intolerably obstruct and delay administration. When supported by 'clear and convincing evidence,' the turnover order has been sustained as an appropriate and necessary step in enforcing the Bankruptcy Act. Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419; Cooper v. Dasher, 290 U.S. 106, 54 S.Ct. 6, 78 L.Ed. 203. See also Farmers & Mechanics National Bank v. Wilkinson, 266 U.S. 503, 45 S.Ct. 144, 69 L.Ed. 408.

"But this procedure is one primarily to get at property rather than to get at a debtor. Without pushing the analogy too far, it may be said that the theoretical basis for this remedy is found in the common law actions to recover possession—detinue for unlawful detentions of chattels and replevin for their unlawful taking—as distinguished from actions in trespass or trover to recover damages for the withholding or for the value of the property. Of course the modern remedy does not exactly follow any of these ancient and often overlapping procedures, but the object—possession of specific property—is the same. The order for possession may extend to proceeds of property that has been disposed of, if they are sufficiently identified as such. But it is essentially a proceeding for restitution rather than indemnification, with some characteristics of a proceeding in rem; the primary condition of relief is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so. It is in no sense based on a cause of action for damages for tortious conduct such as embezzlement, misappropriation or improvident dissipation of assets.

"The nature and derivation of the remedy make clear that it is appropriate only when the evidence satisfactorily establishes the existence of the property or its proceeds, and possession thereof by the defendant at the time of the proceeding. While some courts have taken the date of bankruptcy as the time to which the inquiry is directed, we do not consider resort to this particular proceeding appropriate if, at the time it is instituted, the property and its proceeds have already been dissipated, no matter when that dissipation occurred. * * *

\* \* \* \* \* \*

"The trustee usually can show that the missing assets were in the possession or under the control of the bankrupt at the time of bankruptcy. To bring this past possession down to the date involved in the turnover proceedings, the trustee has been allowed the benefit of what is called a presumption that the possession continues until the possessor explains when and how it ceased. This inference, which might be entirely permissible in some cases, seems to have settled into a rigid presumption which it is said the lower courts apply without regard to its reasonableness in the particular case.

"However, no such presumption, and no such fiction, is created by the bankruptcy statute. None can be found in any decision of this Court dealing with this procedure. Language can, of course, be gleaned from judicial pronouncements and texts that conditions once existing may be presumed to continue until they are shown to have changed. But such generalizations, useful enough, perhaps, in solving some problem of a particular case, are not rules of law to be applied to all cases, with or without reason.

\* \* \* \* \* \*

"Of course, the fact that a man at one time had a given item of property is a circumstance to be weighed in determining whether he may properly be found to have it at a later date. But the inference from yesterday's possession is one thing, that permissible from possession twenty months ago quite another. With what kind of property do we deal? Was it salable or consumable? The inference of continued possession might be warranted when applied to books of account which are not consumable or marketable, but quite inappropriate under the same circumstances if applied to perishable merchandise or salable goods in considerable demand. Such an inference is one thing when applied to a thrifty person who withdraws his savings account after being involved in an accident, for no apparent purpose except to get it beyond the reach of a tort creditor, see Rosenblum v. Marinello, 2 Cir., 133 F.2d 674; it is very different when applied to a stock of wares being sold by a fast-living adventurer using the proceeds to make up the difference between income and outgo.

"Turnover orders should not be issued or affirmed on a presumption thought to arise from some isolated circumstances, such as one time possession, when the reviewing court finds from the whole record that the order is unrealistic and unjust. No rule of law requires that judgment be thus fettered; nor has this Court ever so prescribed. Of course, deference is due to the trial court's findings of fact, as prescribed by our rules, but even this presupposes that the trier of fact be actually exercising his judgment, not merely applying some supposed rule of law. In any event, rules of evidence as to inferences from facts are to aid reason, not to override it. And there does not appear to be any reason for allowing any such presumption to override reason when reviewing a turnover order.

"We are well aware that these generalities do little to solve concrete issues. The latter can be resolved only by the sound sense and good judgment of trial courts, mindful that the order should issue only as a responsible and final adjudication of possession and ability to deliver, not as a questionable experiment in coercion which will recoil to the discredit of the judicial process if time proves the adjudication to have been improvident and requires the courts to abandon its enforcement."

The next two requisites of res judicata are that the parties and their privies must be the same as in the prior action, and there must be an absence of fraud or collusion. The above-mentioned findings themselves state that *for purposes of that proceeding* the separate corporate existence of Keeco must be disregarded. That statement does not indicate to this court, under the policy of the Maggio case, that it too should disregard the separate corporate existence of Keeco for the purposes of the action presently before it. The motive to prevent fraud and collusion to the detriment of any party compels this court to include Keeco as an indispensable party, even if such compulsion failed to motivate the debtor in the prior proceedings. The pleadings of plaintiff's receiver, as petitioner in the proceedings under Chapter XI of the Bankruptcy Act, which denied the separate corporate entity of Keeco, were completely unilateral and self-serving, and this court cannot overlook the probability that such transfer of Arkansas assets from an Arkansas corporation by disregarding its corporate entity was to the direct detriment of the Arkansas creditors of Keeco.

A final requirement, as set out in Am.Jur. above, is that the tribunal in the prior action be of concurrent jurisdiction. Here the scope of jurisdiction of two federal courts is governed by the cause of action before each of them. In Illinois there was a proceeding under Chapter XI of the Bankruptcy Act, and before this court there is a civil action for recovery of damages. Here there is no plea to enforce the turnover order as an ancillary proceeding, but a plea for damages arising from a separate cause of action, as stated above in Maggio v. Zeitz, supra. The proceeding under the Bankruptcy Act is an in rem proceeding, whereas the present action is in personam. The Court of Appeals of the Eighth Circuit makes the following distinction between the two types of actions in Thompson v. Terminal Shares, 104 F.2d 1 (8 Cir., 1939), (a proceeding under 11 U.S.C.A. § 205, similar in scope to 11 U.S.C.A., Chapter XI, Sec. 701 et seq., proceedings), at page 9:

"* * * We think that the jurisdiction conferred by Section 77 upon the courts of bankruptcy is not to be regarded as general, plenary, nationwide jurisdiction at law and in equity over all questions incident to the collection of the claims of the debtor against third persons, but is to be considered as the traditional jurisdiction of such courts over the property of a bankrupt, wherever located, freed, however, from those limitations which made ancillary proceedings in other districts necessary, and with the powers which Federal equity courts exercise in receivership proceedings, so far as those powers may be necessary or appropriate in order to preserve and safeguard the property in the actual or constructive possession of debtors and in order to carry on their business pending reorganization."

In 30A Am.Jur., Sec. 326, the basis of the doctrine of res judicata is stated as follows, beginning at page 373:

"The doctrine of res judicata may be said to inhere in the legal systems of all civilized nations as an obvious rule of expediency, justice, and public tranquillity. Public policy and the interest of litigants alike require that there be an end to litigation which, without the doctrine of res judicata, would be endless.

The doctrine of res judicata rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate, the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent. The doctrine of res judicata not only puts an end to strife, but produces certainty as to individual rights and gives dignity and respect to judicial proceedings."

In considering these bases of expediency, justice, and interest of litigants, this court concludes that these ends would not be best served by denying Keeco status as an indispensable party. Making Keeco an indispensable party, so far as this court is concerned, would expedite the proceedings for, then, all parties would be present and all issues would be litigated at one time. There is by far more likelihood of contentious litigation in the future if Keeco is disregarded as a corporate entity at this time. There is no question but that Keeco has not had an opportunity to litigate in any former action. Therefore, this court is of the opinion that it is not precluded from adding Keeco as an indispensable party plaintiff under the doctrine of res judicata based on the Referee's finding in a prior possessory action proceeding under Chapter XI of the Bankruptcy Act.

The court is convinced that Keeco is an indispensable party plaintiff, if not the real party in interest in both cases. And since it is an Arkansas corporation with its principal place of business in Arkansas, it is a citizen of Arkansas.

Therefore, the alignment of Keeco as a party plaintiff will destroy diversity of citizenship between the parties and the jurisdiction of the court will be ousted.

The defendants' motions to dismiss should be sustained, and an order granting the motion and dismissing the complaint of the plaintiff in each case for lack of jursidiction is being entered today.