Donald E. BARNETT, Erma L. Barnett,
and Woody's Camper Sales,
Inc., Plaintiffs,

v.

BORG–WARNER ACCEPTANCE
CORPORATION, a Delaware
Corporation, Defendant.

No. LR–C–80–68.

United States District Court,
E. D. Arkansas, W. D.

April 18, 1980.

David E. Smith, Bryant, Ark., for plaintiffs.

Byron Freeland, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

### FACTS

The plaintiff, Woody's Camper Sales, Inc., is engaged in the retail sale of motor vehicle campers at a location on the outskirts of Little Rock, Arkansas. For the past ten years plaintiff's operations and inventory have been financed by Borg-Warner Acceptance Corporation under a floorplan arrangement. Borg-Warner pays the camper manufacturer its invoice price (less a discount rate which varies from time to time). Along with its invoice the manufacturer sends to the Borg-Warner office in Little Rock the certificate of origin on the camper unit which is retained until Borg-Warner is paid in full. The certificate of origin is necessary in order to obtain a title to the vehicle. When Borg-Warner pays the manufacturer, Mrs. Josephine Love, an administrative assistant in one of Borg-Warner's two Little Rock offices, by virtue of a power of attorney, executes a note from plaintiff to Borg-Warner for the full invoice price of the unit and a trust receipt which are combined in the same instrument. The note is paid when Woody's sells to a

retail customer. He must at that time either pay Borg-Warner in full, or the retail customer must make satisfactory arrangement with Borg-Warner to take over the indebtedness.

In addition to the note which it executes (guaranteed by Barnett et ux individually), Woody's contemporaneously grants a security interest to Borg-Warner. This is by virtue of provisions on the reverse side of the current printed note and trust receipt form entitled "Terms and Conditions" which reads in part as follows: "Second party has a security interest in the inventory listed on the reverse side in accordance with the Security Agreement(s) which debtor has signed, the terms of which are incorporated herein. Under the terms of the Security Agreement, debtor must account for the inventory sold by forwarding to Secured Party its remittance for the amount due as shown in the Purchase Amount column."

The only security agreement signed by Woody's which is part of the record herein is the security agreement executed on November 24, 1975 with Borg-Warner Acceptance Corporation of Arkansas. The latter is a wholly owned subsidiary of Borg-Warner Acceptance Corporation, a Delaware corporation whose principal place of business is Chicago, Illinois. While the defendant subsequently to the hearing produced another security agreement signed by Borg-Warner of Arkansas and the plaintiffs on February 19, 1971, we do not consider it in rendering our decision, since it has not yet been made a part of the record. The Arkansas corporation was chartered on October 30, 1970 under the Arkansas Business Corporation Act, Ark. Acts No. 576 of 1965 (codified as Ark.Stat.Ann. § 64–101 et seq.). Under § 95 of this Act a fictitious name application was filed on April 7, 1971 under which it was stated that business would be conducted under the name of Borg-Warner Acceptance Corporation.

The plaintiff did not sue Borg-Warner Acceptance Corporation of Arkansas, since such a procedure would have thereby destroyed diversity. The sole defendant is Borg-Warner Acceptance Corporation of Delaware, the parent corporation. The latter has now filed a motion to dismiss on the ground that the Arkansas corporation is an indispensable party to this litigation. The gravamen of the complaint filed herein is that Borg-Warner of Delaware has charged the plaintiff a usurious rate of interest under Ark.Stat.Ann. §§ 68–602—603 (Repl. 1979) and Article 19, § 13 of the Arkansas Constitution and has thereby illegally exacted the sum of Five Million Dollars ($5,000,000.00). Plaintiff sues for this sum and in addition asks that all outstanding notes and liens be declared void. We do not reach the merits of this controversy but confine ourselves to the motion to dismiss, a hearing on which was held before the Court on April 10, 1980. Testimony was adduced by the parties, and a number of documentary exhibits were received into evidence. These included copies of the Articles of Incorporation of the Delaware and Arkansas corporations, the security agreement of 11–25–75, a blank form of the note and trust receipts now in use, several actual notes and trust receipts covering Woody's current inventory, and a blank document entitled "BWAC Wholesale Floor Plan," which is a combined note and security agreement. This instrument, which is no longer in use, was used at least as late as 5–8–78 (per deposition of Josephine Love) and reads in part as follows:

> The undersigned debtor does hereby grant to Borg-Warner Acceptance Corporation of Arkansas (herein called "BWAC") a security interest in the articles listed below, which are in the possession of Debtor, and in any substitution, exchanges, replacements, accessories or attachments thereto and in the proceeds thereof (all of which shall hereinafter be called "collateral") to secure all indebtedness or liabilities now existing or hereafter arising of Debtor to BWAC,
>
> .     .     .     .     .
>
> Debtor may only sell the collateral at retail in the regular course of business for not less than the respective lease amounts listed blow. Upon any sale, Debtor shall

forthwith account for and deliver the proceeds thereof to BWAC for application upon the debt in respect to the collateral so sold. Until such accounting and delivery, Debtor shall hold the entire proceeds, in the same form as received IN TRUST for BWAC separate and apart from Debtor's goods and funds.

All operations of Borg-Warner in Arkansas utilized an account in the name of Borg-Warner Acceptance Corporation in a Chicago bank (except a transfer account in a Little Rock Bank to which deposits are made for transfer to Chicago). However, items from the Arkansas offices are coded and separately identified. Thus proceeds in this account relating to Arkansas operations are segregated. Through a computer printout all deposits and withdrawals are listed on a profit and loss statement, which is provided on a monthly basis to the Arkansas offices. One of these is denominated Little Rock No. 2. It is the one through which Woody's was financed and is located in the University Tower Building in Little Rock. Another office, denominated Little Rock No. 1, is located in the Prospect Building, Little Rock, and there is a third office at Springdale in northwest Arkansas. A copy of a computer printout covering the January, 1980 operations of Little Rock No. 2 was introduced into evidence. This printout shows that all income and expenses accruing from the operation of Little Rock No. 2 are segregated in the bank account and form the basis of the profit or loss from its operations. The salaries of employees of that office are items of expense shown in the printout, as well as car expenses, taxes, rent, depreciation on furniture, stationery and attorney fees.

Copies of the recent notes and trust receipts, which are on the printed forms stocked in Chicago at the parent company, make the notes payable to "Borg-Warner Acceptance Corporation, Chicago, Illinois." We do not attach a great deal of significance to this circumstance since all the banking operations are carried out in Chicago and since the proceeds of Arkansas notes (such as Woody's) are credited to the Arkansas office originating the business. We also note the fictitious name registration under which Borg-Warner Acceptance Corporation of Arkansas is also known as Borg-Warner Acceptance Corporation. We consider it of more significance that the current note and trust receipt form (Revised 1978) refers to "the Security agreement which Debtor has signed." The only such security agreement was with Borg-Warner Acceptance Corporation of Arkansas. It should be noted however that another form has been used by Borg-Warner. This is the revised 1977 form. It does not contain the language referred to above in the 1978 form but instead contains in the upper right-hand corner language that "the undersigned (herein called "Debtor") hereby grants to Borg-Warner Acceptance Corporation, Chicago, Illinois (herein called Secured Party) a security interest in the following described property . . . ."

Of the twelve notes and trust receipts admitted into evidence, four contain the language set forth immediately above. Eight contain the following language in the upper right-hand corner: "Capitalized terms herein (including the reverse side hereof) shall have the definition used in the Security Agreement(s) between the Debtor designated below and the Borg-Warner Acceptance Corporation (Secured Party). The inventory shown herein is subject to the terms and conditions of such Security Agreement(s) and shall secure the payment of sums due under a promissory note executed and delivered by or on behalf of Debtor . . . ." The pertinent language on the reverse side was set forth, *supra*.

### OPINION

*Provident Tradesmen's Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968) rejected an inflexible and formalistic approach to joinder problems. As the Court of Appeals for this Circuit has pointed out, it is now clear that Rule 19(b) requires the District Court to undertake a practical examination of the circumstances to determine if a party is indispensable or whether the court may in

equity and good conscience proceed without the missing party:[1]

"The Court made it clear that Rule 19(b) requires a district court to undertake a 'practical examination of the circumstances.' 390 U.S. at 119–20, n. 16 [88 S.Ct. 733], in order to determine whether it must dismiss the action or may 'in equity and good conscience' proceed without an absent party. The Court stated that the four factors listed in the text of Rule 19(b) suggest four interests to be considered in deciding whether to dismiss the action or proceed. n. 5. These four interests are: (1) The interest of the outsider whom it would have been desirable to join; (2) the defendant's wish to avoid multiple litigation or inconsistent relief; (3) the interest of the court and the public in complete, consistent, and efficient settlement of controversies; and (4) the plaintiff's interests in a forum and, on appeal, in preservation of his judgment." *Fetzer v. Cities Service Oil Co.*, 572 F.2d 1250, 1253 (8th Cir. 1978).

We test the evidence in this case against these guidelines.

*The Interest of Borg-Warner Acceptance Corporation of Arkansas in the Litigation and the Extent to Which its Interests Might Be Prejudiced.* Herein lies the crux of the problem presented in this case. The fact that Borg-Warner Acceptance Corporation of Arkansas is a wholly-owned subsidiary of Borg-Warner Acceptance Corporation of Delaware is a factor to be considered but is not decisive. As Judge John E. Miller pointed out in *Keeshin v. Farmers & Merchants Bank of Rogers*, 199 F.Supp. 478 (W.D.Ark.1961), without "need to pierce the corporate veil in order to prevent fraud on third parties, the Supreme Court of Arkansas has made it plain that it intends to preserve the corporate entity of any Arkansas corporation transacting business in Ar-

kansas. This is so even where there has been intermingling of assets between a parent and a subsidiary corporation as well as interlocking directorates, as stated by the Court in *Mannon v. R. A. Young & Sons Coal Co.*, 207 Ark. 98, 179 S.W.2d 457, 460 (1944) . . . ." 199 F.Supp. at 486. It is true that in this case the parent corporation exercised almost total control over Borg-Warner of Arkansas. It is also true that the income and expense from the Arkansas entity was segregated by coding in the parent corporation's bank account and a monthly profit and loss statement was provided covering Borg-Warner's Arkansas operations. The corporate arrangement existing herein is not an uncommon one. In fact it might be said that Arkansas by passage of the Wingo Act encourages such an arrangement. Ark.Stat.Ann. §§ 64–1201— 1202 (1966 Repl.Vol.). In *Lang v. Colonial Pipeline Co.*, 266 F.Supp. 552 (E.D.Pa.1967) the Court said: ". . . the plaintiffs have cited no cases to us and our research has disclosed none where the courts have overlooked the separate identity of a wholly owned subsidiary in order to avoid being ousted of its diversity jurisdiction where that party is indispensable or needed for a full and just adjudication of the controversy." Id. at 557.

To hold that Borg-Warner Acceptance Corporation of Arkansas would not be seriously affected by the relief sought in this cause is totally unrealistic. Since February 19, 1971 and embracing virtually all the pertinent time period, there have been two security agreements executed by the plaintiffs. Both have been with Borg-Warner Acceptance Corporation of Arkansas. Until the middle of 1978 the notes executed by the plaintiff were specifically made payable to Borg-Warner Acceptance Corporation of Arkansas. A substantial portion of the notes made thereafter incorporated by

1. "The factors listed in Rule 19(b) are: (1) The extent to which a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." *Fetzer v. Cities Service Oil Co.*, 572 F.2d 1250, 1253 n. 5 (8th Cir. 1978).

reference the "Security Agreement(s) which Debtor has signed." This could only refer to security agreements the Debtor had signed with Borg-Warner Acceptance Corporation of Arkansas. Plaintiff did execute a security agreement with Borg-Warner Corporation of Illinois on September 30, 1970 before Borg-Warner Acceptance Corporation of Arkansas was organized on October 30, 1970. On February 19, 1971 a new security agreement was executed with the Arkansas Corporation and again on November 24, 1975. Such a new filing was required under the Uniform Commercial Code (Ark.Stat. § 85–9–403 (1961 Add.)) and is effective until November 24, 1980. In the complaint plaintiffs ask that all outstanding notes and security interests be voided. When these security interests arise by virtue of an agreement with Borg-Warner Acceptance Corporation of Arkansas, how can it be seriously argued that the latter's interests would not be affected? In addition plaintiff asks Five Million Dollars for illegal exactions by virtue of usurious interest paid on notes and security agreements made for the most part payable to Borg-Warner of Arkansas. While a judgment could not be rendered against the Arkansas Corporation in its absence, presumably nothing would prevent future litigation against it by the plaintiffs in which the same issues were raised. In fact plaintiffs base most of their argument on the fact that a judgment "against the defendant would have no effect on the potential intervenor" (Deft. Supp.Brief p. 7). The Court of Appeals of this Circuit in Kozak v. Wells, 278 F.2d 104, 110 (8th Cir. 1960) responded to a similar argument that a potential intervenor would be unaffected by a judgment against the defendant. The Court quoted an earlier case, Ford v. Bisanz Bros., Inc., 249 F.2d 22, 28 (8th Cir. 1959) to the effect that " 'in a very real sense (the applicant-intervenors) would be bound, since obviously such a judgment' would determine the legal effectiveness of the attacks against the state court order and judgment . . . and the result would certainly establish an adverse precedent for the intervenors." 278 F.2d 104 at 110. The considerations with respect to this facet of the case are summarized by the Supreme Court in Provident Bank v. Patterson, supra :

"Third, there is the interest of the outsider whom it would have been desirable to join. Of course, since the outsider is not before the court, he cannot be bound by the judgment rendered. This means, however, only that a judgment is not res judicata as to, or legally enforceable against, a nonparty. It obviously does not mean either (a) that a court may never issue a judgment that, in practice, affects a nonparty or (b) that (to the contrary) a court may always proceed without considering the potential effect on nonparties simply because they are not "bound" in the technical sense. Instead, as Rule 19(a) expresses it, the court must consider the extent to which the judgment may "as a practical matter impair or impede his ability to protect" his interest in the subject matter. When a case has reached the appeal stage the matter is more complex. The judgment appealed from may not in fact affect the interest of any outsider even though there existed, before trial, a possibility that a judgment affecting his interest would be rendered. When necessary, however, a court of appeals should, on its own initiative, take steps to protect the absent party, who of course had no opportunity to plead and prove his interest below." 390 U.S. 102, 110, 88 S.Ct. 733, 738–739, 19 L.Ed.2d 936.

There are two cases which to a considerable extent parallel the facts of the case at bar. One is Keeshin v. Farmers & Merchants Bank of Rogers, supra, a case arising in the Western District of Arkansas. An Illinois parent corporation sued to recover payment made by a subsidiary Arkansas corporation and for damages arising out of the subsidiary's assignment of certain property for the benefit of creditors. Defendant Arkansas residents moved to dismiss on the ground that the Arkansas subsidiary was indispensable and Judge Miller granted

the motion. "Doubtlessly, there would be an injurious effect on the interest of the absent Keeco (the subsidiary), because as stated above, it is the assets of Keeco that are involved in this litigation. If Keeshin (the parent) is denied recovery of the value of the assets involved, the loss would be suffered by Keeco." 199 F.Supp. at 484. Judge Miller pointed out the danger of estoppel in subsequent litigation between plaintiff and the absent subsidiary:

"As to Keeco, an existing Arkansas corporation, the ends of equity and justice would not be best served by denying it the opportunity to recover its assets in its own name. As stated above, if plaintiff were to be allowed to prosecute the causes of action alleged in the present cases and it were to fail, then Keeco would probably be estopped from later prosecuting in its own cause of action in its own name."

The same danger exists in the case at bar. While it is by no means certain that the doctrine of estoppel would arise with respect to defenses, the Arkansas Corporation might assert in future litigation with the plaintiffs, the possibility is not far-fetched. "Second, Bodcaw raises the possibility of inconsistent judgments by suggesting that it may relitigate its claim to title against the Railroad in state court. Assuming that Bodcaw ultimately loses, and on remand the district court affirms its judgment in plaintiffs' favor, Bodcaw will undoubtedly meet stiff legal resistance in the form of possible pleas of estoppel or collateral estoppel in state court. However, we need not investigate such murky areas now." *Fetzer v. Cities Service Oil Co., supra* at 1254.

In *Lang v. Colonial Pipeline Co.,* 266 F.Supp. 552 (E.D.Pa.1967) resident Pennsylvania landowners filed a diversity action in ejectment against Colonial Pipeline of Delaware, acting through a wholly owned subsidiary. Colonial of Pennsylvania had constructed a pipeline without permission across plaintiff's property. Colonial of Delaware moved to dismiss for failure to join the Pennsylvania Corporation. In holding that the latter was an indispensable party, the court said:

"Colonial of Pennsylvania holds the title to the interest in plaintiffs' land [a pipeline easement], while Colonial of Delaware advances the money to pay for the realty, makes the improvements, provides the necessary personnel, and generally runs the pipeline business.

"It goes without saying that any action to eject the parent from the land would have a definite adverse effect on its subsidiary. The latter's estate in the land as well as its corporate existence is inextricably tied to the operation of the pipeline. If Colonial of Delaware is removed there is little doubt that the easement will be virtually worthless since it was originally condemned simply to facilitate the transportation of petroleum. We have no trouble in finding that Colonial of Pennsylvania is an indispensable party, for any adjudication of the present controversy in its absence would significantly affect its interests and would not be consistent with equity and good conscience. *The fact that it is a wholly owned subsidiary of a party already before the court does not negate its indispensability. Lang v. Colonial Pipeline Co.,* 266 F.Supp. 552, 554 (E.D.Pa.1967)." (Citations omitted and emphasis added.)

This is not a case where the rights of the absent person can be preserved while granting relief only among those who are parties before the Court. There is no fund that can be reserved to protect Borg-Warner of Arkansas' interest. Compare *Atwood v. Rhode Island Hosp. Trust,* 275 F. 513 (1st Cir. 1920), *cert. denied,* 257 U.S. 661, 42 S.Ct. 270, 66 L.Ed. 422 (1922). Nor is this a case where damages can adequately substitute for the declaratory relief and thereby protect the absent person. Compare *Television Reception Corp. v. Dunbar,* 426 F.2d 174 (6th Cir. 1970).

*The Avoidance of Multiple Litigation or Inconsistent Relief.* A serious question ex-

ists as to whether plaintiff can litigate the usurious nature of most of the notes involved against the sole defendant, Borg-Warner Acceptance Corporation of Delaware. The court finds on the basis of the evidence presented that the connection of the Delaware Corporation with these transactions is more tenuous than their connection with Borg-Warner of Arkansas. Litigation without Borg-Warner of Arkansas would leave much of this lawsuit undecided. "As to the named parties, failure to join Westinghouse would be prejudicial to the defendant in that defendant might possibly be found to litigate the entire matter twice, depending upon any action Westinghouse might bring in a Pennsylvania state court." *Republic Realty Mfg. Corp. v. Eagson Corp.,* 68 F.R.D. 218 (E.D.Pa.1975). Relegation of these plaintiffs to the courts of their own state would impose no undue hardship on them. By filing this action in state court, the plaintiffs could in one action settle all the issues involved herein without the very real possibility of proceeding in the wrong forum. If Borg-Warner of Arkansas is an indispensable party to this litigation, then jurisdiction is destroyed. Jurisdiction can be raised at any stage of the proceedings, even after the case reaches appeal status. "The issue of indispensability of parties may be raised at any stage of the proceedings and as late as appeal. See *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 88 S.Ct. 733 [19 L.Ed.2d 936]; Fed.R.Civ.P. 12(h)(2) 19, 21; 7 Wright and Miller, supra § 1609 at 88." *Fetzer v. Cities Service Oil Co., supra* at 1253, note 6. This disposes of plaintiffs' argument that defendant has waived the right to raise the "indispensable party" issue by moving to dismiss after filing an answer and counterclaim. Plaintiff in this case could litigate all the basic issues in a long trial on the merits and then be summarily relegated to state court after the case has reached appeal status. This is not a case such as *Fetzer v. Cities Service Oil Co., supra,* where the parties had been in litigation for four years at untold time and expense.

This complaint was filed February 12, 1980, barely two months ago. Plaintiffs argue that the delay involved in a dismissal and refiling in state court would impose great economic hardship on them, but incomparably more economic hardship would be imposed if they lost the jurisdictional argument after a trial on the merits and at an appeal stage.

There is another serious problem. Litigation of these issues in state court against Borg-Warner of Arkansas could well result in inconsistent judgments in state and federal courts. A single state court trial with both Borg-Warner corporations as defendants and a trial to either court or jury would virtually eliminate the chance of inconsistent verdicts—a real possibility if the case remains in its present posture.

*The Interest of the Court and the Public in Complete Consistent, and Efficient Settlement of Controversies.* "We read the Rule's third criterion, whether the judgment issued in the absence of the nonjoined person will be adequate,' to refer to this public stake in settling disputes by wholes, whenever possible, for clearly the plaintiff, who himself chose both the forum and the parties defendant, will not be heard to complain about the sufficiency of the relief obtainable against them." *Provident Tradesmens Bank & Trust Co. v. Patterson, supra* at 11, 88 S.Ct. 733, at 739. Everything we have said previously in this opinion bears on this factor. The Court finds that in the absence of Borg-Warner of Arkansas this litigation probably cannot be brought to its ultimate conclusion but will undoubtedly spawn further state court proceedings. Already mentioned is the possibility of a jurisdictional overturn at the appellate level after months and even years of litigation. Admittedly courts are more reluctant to find indispensability at this level. Compare *Fetzer v. Cities Service Oil Co., supra.* (Absent certain factors not found in the case at bar the Court may well have found indispensability at the appellate level in *Fetzer.*)

*The Plaintiff's Interest in Having a Forum and Preserving His Judgment on Appeal.* "Before the trial, the strength of this interest obviously depends upon whether a satisfactory alternative forum exists. On appeal, if plaintiff has won, he has a strong additional interest in preserving his judgment." *Provident Tradesmens Bank & Trust Co. v. Patterson, supra* at 109–110, 89 S.Ct. 733, 738. The Advisory Committee on the Federal Rules of Civil Procedure, in its Note on the 1966 Revision of Rule 19, quoted at 3 Moore, Federal Practice ¶ 19.01 (hereinafter cited as "Committee Note"), comments as follows on the fourth factor listed in Rule 19(b), the adequacy of plaintiff's remedy if the action is dismissed: "[T]he court should consider whether there is any assurance that the plaintiff, if dismissed, could sue effectively in another forum where better joinder would be possible." See *Fitzgerald v. Haynes,* 241 F.2d 417, 420 (C.A. 3d Cir.); *Fouke v. Schenewerk,* 197 F.2d 234, 236.

There are no impediments to plaintiff's suing in state court. It is only in state court that all of plaintiff's claims can be resolved against all of the creditors involved. Moreover, plaintiffs will suffer no procedural disadvantage since the Arkansas Rules of Civil Procedure are now essentially identical to their federal counterparts.

"When the state court remedy is live, the district courts have been slow to deem it inadequate. Since in a diversity case the district court would apply the state law, normally the plaintiff will not be heard to complain about the competence of state courts to deal with the subject matter, and complaints about the inhospitality of the state courts to his contentions, or generalized hostility to outsiders, have not been availing. The mere fact that the plaintiff must start over in the state court does not preclude dismissal." 3A *Moore's Federal Practice,* ¶ 19.07–2[4], at p. 19–179 (footnotes omitted).

The Court of Appeals for the Fifth Circuit in *Doty v. St. Mary Parish Land Co.,* 598 F.2d 885 (5th Cir. 1979) had the following pertinent comments concerning the availability of a state forum:

"The final factor is one which in the end, we find to be most persuasive—the presence of an adequate forum if the action is dismissed. It is undisputed that the present action could be brought in a Louisiana state court, where complete relief would be afforded among all the parties. We have previously found the presence of a state forum to be compelling in these kinds of cases, see, e. g., *Broussard v. Columbia Gulf Transmission Co.,* 398 F.2d 885 (5th Cir. 1968), and we summarily reject the suggestion by appellants that the state courts may not be competent to decide the present controversy." *Id.* at 888.

We have previously alluded to the interest of the plaintiff in preserving his judgment. It is our considered opinion that any judgment rendered in this Court only against Borg-Warner of Delaware would be subject to considerable risk on appeal, a risk that would hardly be present in state court litigation.

*The Framing of Relief Without the Presence of Borg-Warner of Arkansas.* Plaintiffs argue that this Court could frame relief against Borg-Warner of Delaware without affecting any rights of the Arkansas corporation. This could be done by severing all claims based on notes payable to Borg-Warner of Arkansas and proceeding to judgment only on the remaining claims. We agree with defendant that such a procedure would frustrate Rule 19's underlying purpose of consolidating all claims for a single, consistent, economic disposition. Severing part of the claims will not reduce the threat of prejudice to Borg-Warner of Arkansas. Severance of the claims will simply guarantee plaintiffs an opportunity to relitigate their claims in state court regardless of the outcome of the present case.

Again we call attention to the decision of the Fifth Circuit in *Doty v. St. Mary Parish Land Co.,* 598 F.2d 885 (5th Cir. 1979):

"The second factor requires a consideration of the extent to which prejudice may be minimized by limiting the relief granted. Yet it is difficult to conceive of a method by which the relief given in this case could be tailored to avoid prejudice to the lessee. Appellants in their complaint seek to establish their ownership to the land by having the defendant's title declared null and void. To grant them any relief at all would engender the problems we have previously discussed. In view of the relief requested by appellants, we are unable to devise, and appellants have yet to suggest, a form of relief that would minimize the prejudice to the mineral lessee. Thus the present case is to be distinguished from those cases relied upon by appellant in which the courts were able to minimize prejudice to absent parties by carefully shaping the relief given." Id. at 887.

■ *A Finding that Borg-Warner of Arkansas and Borg-Warner of Delaware Are One Entity Would Not Accrue to Plaintiffs' Benefit.* Plaintiffs have argued that Borg-Warner of Delaware and Borg-Warner of Arkansas are not separate legal entities, but that they are essentially one and the same company. Assuming arguendo that Borg-Warner of Delaware and Borg-Warner of Arkansas are treated as a single entity, that fact alone would destroy diversity jurisdiction. If Borg-Warner of Delaware and Borg-Warner of Arkansas are treated as a single entity, the October 30, 1970 incorporation of Borg-Warner of Arkansas amounted to a second or dual incorporation of the parent Delaware corporation. Borg-Warner of Delaware would thus be a multi-state corporation incorporated in Delaware and Arkansas with its principal place of business remaining in Chicago. Borg-Warner of Delaware would become a citizen of Arkansas for purposes of federal diversity jurisdiction, because of its dual incorporation. 28 U.S.C. 1332(c) provides that ". . . a corporation shall be deemed a citizen of any State by which it

has been incorporated and of the State where it has its principal place of business . . . ." The language of the statute is clear. A corporation is considered a citizen of *any* State by which it has been incorporated. Even before the 1958 amendment to § 1332 the U.S. Supreme Court in *Jacobson v. New York, New Haven and Hartford Railroad Co.*, 347 U.S. 909, 74 S.Ct. 474, 78 L.Ed. 1067 (1954) affirmed a First Circuit decision dismissing a suit because of lack of diversity when a citizen of Massachusetts sued a railroad incorporated in both Massachusetts and Connecticut in a Massachusetts federal court. The same results were reached in cases involving multi-state incorporation in *Seavey v. Boston and Maine Railroad Co.*, 197 F.2d 485 (1st Cir. 1952) and *Di Frischia v. New York Central Railroad Co.*, 279 F.2d 141 (3rd Cir. 1960).

■ *The Fact that Defendant's Counterclaim Asserts Federal Constitutional Issues Does Not Give this Court Jurisdiction.* Plaintiff contends that jurisdiction is vested by the fact that defendant filed an amended answer and counterclaim asserting that the usury provisions of the Arkansas statutes and Constitution violate Art. 6, cl. 2, Art. 1, § 8, cl. 3, and the Fourteenth Amendment of the United States Constitution. These contentions actually arise by way of defense and cannot serve to vest this court with jurisdiction. In *Louisville & Nasvhille R. Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), the plaintiffs brought an action against the defendant railroad to require specific performance of a contract for breach of contract, the plaintiffs alleged that the act of Congress proscribing the use of free passes on which the defendant would rely was unconstitutional. With no diversity existing, the Supreme Court dismissed the action because of a lack of federal question jurisdiction since the constitutional issue did not arise by way of the plaintiff's claim but rather in anticipation of a defense. *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 33 S.Ct. 410, 757 L.Ed. 716 (1913); *Devine v. City of Los*

*Angeles,* 202 U.S. 313, 26 S.Ct. 652, 50 L.Ed. 1046 (1906). "Consequently, we have no Federal question jurisdiction here since the constitutional element arises only by way of defense." *Lang v. Colonial Pipeline Co., supra* at 556.

"Even if we assume that the defendant was acting under color of state authority through the exercise of the eminent domain power, we must determine whether the allegation of a violation of the Fourteenth Amendment is sufficient to give us jurisdiction under the circumstances here. It is well settled that an action does not arise under the Constitution within the meaning of 28 U.S.C. § 1331 if the federal question enters the picture only by way of a defense or in anticipation of a defense that the plaintiff expects the defendant to make. It must be an integral part of the statement of the plaintiff's claim for relief in order for this court to have jurisdiction." 266 F.Supp. at 555.

There is another reason why this Court is not impressed with the argument that federal jurisdiction is conferred by defendant's counterclaim. Defendant can at any time dismiss his counterclaim and thus frustrate jurisdiction solely based on constitutional claims.

For the reasons stated in this memorandum opinion, Borg-Warner Acceptance Corporation of Arkansas is found to be an indispensable party to this litigation and defendant's motion to dismiss is granted.